# Staunton

TRI-STATE COACH CORPORATION, ET AL. V. RODNEY WALSH.

September 8, 1948.

Record No. 3351.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

*Fred B. Greear*, for the plaintiffs in error.

*Charles F. Hagan*, for the defendant in error.

MILLER, J., delivered the opinion of the court.

Rodney Walsh, hereinafter called plaintiff, instituted this action against Tri-State Coach Corporation, referred to herein as Tri-State, and James Howard Mooney, who will be called Mooney, to recover damages for personal injuries and property loss. Verdict was returned against both defendants for $400 and judgment entered therefor.

The record discloses the following facts: Tri-State was owner of a bus line for the transportation of passengers between Bristol, Virginia, and other points. Mooney was a regular employee of that corporation, his duties being those of a bus driver.

Piedmont Street, in Bristol, intersects State Street at right

angles. Near to and where it enters State Street, it is marked for three lanes of traffic. The right lane is for traffic which is to turn right on State Street; the middle lane for that proposing to cross the intersection or turn left, and the left lane is used by vehicles coming out of State Street and turning right into Piedmont Street. A signal light controls traffic at the intersection.

About seven o'clock on the evening of February 14, 1947, Mooney, on his regular route between Bristol and Gate City, Virginia, drove a bus belonging to Tri-State along Piedmont Street towards State Street with intention of making a right turn thereon.

Due to the length of the bus and to better effect the rather sharp right turn that had to be made, he drove some distance away from the curb, thereby placing the left wheels in the center lane. As he immediately approached and reached the intersection, the bus was astride the line between the center and right traffic lanes. It was stopped at the intersection by a red traffic light. A space wider than an automobile was left between the bus and the right curb.

At this time, plaintiff, who was driving his automobile in the same direction along Piedmont Street, approached the intersection in the extreme right lane. This placed his automobile between the right side of the bus and the curb. It appears that plaintiff reached the intersection about the same time as the bus or momentarily thereafter. He was also stopped by the traffic light and the two vehicles were about two to three feet apart.

With the vehicles standing awaiting the change in the traffic light, plaintiff's brother, who was to meet him on that corner, walked toward the automobile with the intention of entering it. Before he entered the car, the traffic light flashed green and the bus undertook to move forward and make the right turn in front of the stationary automobile. Plaintiff and his brother became apprehensive that the turning bus would strike the left fender, hence plaintiff called to Mooney to hold the bus a minute as "he was going to hit my fender * * * ."

Before completing the turn, Mooney stopped the bus and, in opening the front door, struck plaintiff's car. Plaintiff thereupon exclaimed, "Go easy on my fender." Mooney alighted and looked at his front and rear signal lights. He then came to the left window of plaintiff's automobile, engaged in an argument with him about the signal lights on the bus, his place in the road, and which vehicle had crowded the other. The turn had not been wholly negotiated and the vehicles stood close together. While the vehicles occupied these positions, plaintiff and Mooney continued to argue about their location, the signal lights on the bus indicating the intention to turn, their respective rights in the road, etc. Mooney thereupon struck plaintiff in the face, rendering him momentarily unconscious and causing his nose to bleed rather profusely. Due to the blow, plaintiff lost control of his automobile which was in gear. It started forward, turned slightly to the right, mounted the curb, crossed the sidewalk and struck a brick building, thereby causing considerable damage to the car.

Mooney admits the argument about the location of the vehicles in the street, the signal lights on the bus, and plaintiff's assertion that Mooney had crowded in on him. Mooney says, however, that plaintiff called him a liar and that is why he struck him. Plaintiff denies having used that language. Yet if such were said, it is evident that it grew out of and was a part of the contention regarding the operation of the respective motor vehicles, their then rights on the road, and the possible danger to plaintiff's automobile if Mooney moved forward in the direction already partially undertaken, *viz*, a short right turn with a long vehicle in dangerous proximity to plaintiff's car.

The case is before us upon a verdict for the plaintiff upon which judgment has been entered. All conflicts in the testimony have been settled in his favor and he is entitled to all just inferences deducible therefrom. *Walker* v. *The Memorial Hospital*, 187 Va. 5, 45 S. E. (2d) 898. Fortified by the jury's verdict and judgment of the court,

he also occupies the most favored position known to the law. *Neal* v. *Spencer*, 181 Va. 668, 26 S. E. (2d) 70.

Defendants rely upon several assignments of error. Briefly stated, they are as follows:

Tri-State contends that:

(1) Mooney was acting beyond the scope of his employment when he inflicted the blow upon the plaintiff and thus defendant corporation is not liable for the ensuing damages.

(2) The court erred in giving Instruction 4 on behalf of the plaintiff.

Both defendants contend that:

(3) The court was in error in giving Instruction 3 on behalf of the plaintiff.

(4) The verdict was excessive.

(5) The court should not have admitted certain testimony in rebuttal.

It must be remembered that the altercation arose about the manner in which Mooney was operating the bus. It occurred while he was undertaking to make a right turn which plaintiff was apprehensive would bring the bus in collision with his car.

Both drivers claimed rights on the road and the tort was inflicted by Mooney in asserting his claim and in executing the service for which he was employed. The blow was struck before the turn was negotiated and it was a part of Mooney's contention that he was rightfully in position on the highway to make such turn. He insisted that the signal lights having indicated his intention to turn, therefore he was entitled to turn in front of the plaintiff's car. In furtherance of this intention and claimed right so to operate the bus though its proximity gave concern to plaintiff, Mooney committed the tort. Both vocal insistence and physical force were used in the attempt to complete the movement of the bus undertaken by Mooney.

The master's liability is not wholly dependent upon the motive of the employee in committing the tort. It is determined by ascertaining whether his actions were in the performance of the duties of his employment and in execu-

tion of the service entrusted to him. If so, the master is liable though the immediate act goes beyond the servant's strict line of duty and authority and be not in the interest of the master.

Anger, malice, vindictiveness,—frailties of human nature,—are among the risks imposed upon the master in the employment of his servants. When these emotions are indulged in by the servant, even to the extent of committing a wilful tort, if the ultimate purpose to be thereby attained is in furtherance of the servant's duties and in execution of the master's business entrusted to him, the master is liable for the resultant damage.

Though this was an intentional and wilful tort, the jury was justified in concluding that it was the result of an impulse or emotion which directly arose out of the prosecution of the master's business and was within the course of the employment.

Had the turn been wholly negotiated into State Street, thus avoiding the real or apparent danger of collision, and Mooney had then abandoned the business of his master and committed the tort solely to gratify his personal feelings and not to accomplish or effect his insistence upon his right of movement, it would not have been within the scope of his employment; but here it was committed in the very act of negotiating the turn. It was part and parcel of Mooney's insistence and contention that he was properly operating the bus and intended to insist upon his rights in the highway. Because his demands were physical and emphatic renders it no less in furtherance of the master's business.

We find the modern and better view stated thus in 35 Am. Jur., Master and Servant, sec. 560, p. 994:

" * * * The courts, however, have long since departed from the rule of non-liability of an employer for wilful or malicious acts of his employee. Under the modern view, the wilfulness or wrongful motive which moves an employee to commit an act which causes injury to a third person does not of itself excuse the employer's liability therefor. The test of liability is not the motive of the

employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the execution of the service for which he was engaged. It may not be inapposite to note that a corporation is deemed to be responsible for the acts of an agent performed while engaged in the discharge of duties within the general scope of his agency although the particular act was wilful and malicious. This does not mean that the motive which actuated the employee is of no importance. Under some circumstances, at least, the motive which actuated the employee may be of prima facie importance."

In discussing the same subject, this is said in 3 C. J. S., Agency, sec. 255, p. 187:

"In order to determine whether an agent's tort was within the scope of his employment, the proper inquiry is: Was the act done in the course of the agency and by virtue of the authority as agent with a view to the principal's business. It may be stated broadly that the tort of an agent is within the course of his employment where the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose; but the act may be within the scope of the agent's authority, and yet not be in the interest of the principal or in the prosecution of the principal's business. * * * "

See also, Restatement of Agency, Master and Servant, sec. 245, pp. 547-552, and 3 C. J. S., Agency, sec. 258, p. 192.

That Virginia adheres to this view is made evident by the decisions of *Myers & Co.* v. *Lewis*, 121 Va. 50, 92 S. E. 988, and *Davis* v. *Merrill*, 133 Va. 69, 112 S. E. 628.

In the latter case, one of the duties of Ford, an employee of the railroad, was to raise and lower the gates at a street crossing over the railroad so as to permit traffic to pass in safety. On the night in question, when plaintiff's intestate reached the crossing in an automobile, the gates were closed though no train was then approaching. Upon being called several times, the gateman came from a nearby storehouse.

The driver of the automobile in which the plaintiff's decedent was seated asked him to raise the gates. His reply was, "There is other crossings you can go over besides this one." The chauffeur thereupon stated that he did not have time to go about looking for crossings when there was no train blocking or approaching this crossing. Ford then proceeded towards a tower from which the gates were operated and started up into the same mumbling something that the chauffeur did not understand. Upon entering the tower box, he raised the gates and as the car proceeded over the crossing, he fired three pistol shots at or towards the rear of the car, one bullet struck and killed plaintiff's intestate.

Speaking of the responsibility of a master for wilful and malicious torts of a servant, the court says at page 77:

"In the instant case the contention arose over the raising of the gates at a late hour of the night, a matter admittedly within the scope of the gateman's employment and duty, and as an immediate result thereof, the gateman shot and killed the deceased. The two acts constitute parts of one and the same transaction.

"In 2 Mechem on Agency (2nd Ed.), section 1960, the author defines 'scope of employment' as follows:

" 'In many cases, no better definition can be given than the words themselves suggest. But, in general terms, it may be said that an act is within the scope of the employment if (1) it be something fairly and naturally incident to the business, and (2) if it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account.' "

Several authorities are cited by Tri-State upon the question under consideration. Among them are *Master Auto Service Corp.* v. *Bowden*, 179 Va. 507, 19 S. E. (2d) 679;

1 Shearman and Redfield on Negligence, Rev. Ed., sec. 158, p. 373; 18 R. C. L., Master and Servant, sec. 263, p. 807.

Upon examination of the above references, it is appropriate to say that they all recognize the correctness of the principle applied by the trial court in the case at bar and are not in conflict with the decisions of *Davis* v. *Merrill, supra,* and *Myers & Co.* v. *Lewis, supra.*

From a factual standpoint, Tri-State relies upon the two cases of *Georgia Power Co.* v. *Shipp,* 195 Ga. 446, 24 S. E. (2d) 764, and *Wood* v. *Southeastern Greyhound Lines,* 302 Ky. 110, 194 S. W. (2d) 81. A careful analysis of the facts of these cases discloses that in each instance at the time of the commission of the tort the employee had entirely departed from the business of the principal and it was not within the scope of the duties of the employment nor was it in execution of the service in which he was engaged. They, therefore, factually fall within that class of cases where no liability attaches to the master because of the servant's wrongful and malicious act. The law applicable thereto is succinctly stated in 3 C. J. S., Agency, sec. 255, p. 187.

"If the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business, the relation of agency and the agent is for that time suspended, and the agent is not acting within the scope of his employment."

This principle is well-established, but the exact line of demarcation between what acts are within the scope of employment and what are not is, at times, difficult of ascertainment. The inferences to be drawn from the facts proved are often within the province of a jury.

For a very recent case presenting facts and circumstances almost identical with those now under consideration wherein it was held that the wilful tort was committed by the servant while occupying himself with his master's business and was within the scope of his employment, see *Fields* v. *Sanders,* 29 Cal. (2d) 834, 180 P. (2d) 684.

We are therefore of opinion that submission to the jury

of the question of Tri-State's liability for the tort committed by Mooney was justified by the evidence.

There is no evidence or claim that Tri-State expressly authorized or ratified this tort. No punitive damages could be awarded against that defendant upon the record before us.

An inspection of all instructions given discloses that plaintiff was limited to recovery of compensatory damages for personal injuries occasioned by the tort and property loss proximately caused thereby. The claim for personal injuries included those elements of compensatory damage allowable in actions of assault and battery. They are not limited to the pecuniary loss and actual physical injury sustained.

Instruction 3 which undertakes to state elements of damage recoverable is as follows:

"The Court instructs the jury that in actions of this kind they are not confined to the actual pecuniary damages or loss in terms of money sustained by the plaintiff, but they may take into consideration the motive of the defendant, if any is shown, the insulting character of the assault, if such be shown, and all circumstances of aggravation attending the act, if any. Such damages, if any such have been shown, are in their nature actual or compensatory as much as those given for bodily harm, pain, suffering, loss of time and expenses incurred."

In *Wilkinson* v. *Allen*, 136 Va. 607, at p. 613, 118 S. E. 94, it is said that the elements which may be considered in arriving at the actual or compensatory damages allowable in actions of this character embrace "shame, mortification, humiliation, indignities to feelings and the like * * *."

In general terms, Instruction No. 3 authorized the jury to consider these elements but in so doing further stated that the jury "may take into consideration the motive of the defendant * * *." This exact language was used in an instruction given in *Wilkinson* v. *Allen, supra,*—in fact, the entire instruction is a copy from one in that case. However, there the action was only against the party who personally committed the tort.

We think that when the jury was allowed to "take into consideration the motive of the defendant * * *", that language encroached upon, if it did not permit, the awarding of exemplary damages. That character of damage could not here be properly allowed against Tri-State. In this case, the instruction is subject to criticism. The corporate defendant was joined with the individual who committed the wilful tort and the jury might have been justified in entering the field of punitive damages under that language. It did not clearly or sufficiently limit them to compensatory damages alone. *Bannister* v. *Mitchell*, 127 Va. 578, 104 S. E. 800, 16 A. L. R. 768, and *Borland* v. *Barrett*, 76 Va. 128, 44 Am. Rep. 152.

The instruction, with that statement standing unqualified, might well have been misleading. However, we are of the opinion that Instruction D which reads as follows, "The Court instructs the jury that in this case they cannot find punitive or exemplary damages against the defendants," cured this defect. It expressly precluded the allowance of punitive damages against either defendant.

That an error not amounting to a positive misstatement of law can be cured by a clear, definite and correct statement upon the same subject in another instruction is beyond question. *Virginia Ry., etc., Co.* v. *Smith & Hicks*, 129 Va. 269, 105 S. E. 532; *Towson* v. *Towson*, 126 Va. 640, 102 S. E. 48; *E. I. DuPont de Nemours & Co.* v. *Taylor*, 124 Va. 750, 98 S. E. 866; *Russell Creek Coal Co.* v. *Wells*, 96 Va. 416, 31 S. E. 614, and Burks' Pleading and Practice, 3rd Ed., sec. 259, p. 467.

It is made certain by the amount of the verdict that the jury was not misled. The evidence establishes an actual property damage to the automobile of $329.00—the total award was $400. The irresistible conclusion is that no punitive damages were allowed. As an award of compensatory damages only, it is not excessive and is fully warranted by the evidence.

We find no error in Instruction No. 4, which reads as follows:

"The Court instructs the jury that the defendant, Tri-State Coach Corporation, is liable for an injury brought about by the misconduct of its agent and employee, James Howard Mooney, acting within the scope of his employment, whether such misconduct was wilful and intentional, or not wilful and intentional.

"The question of whether the defendant, Mooney, was acting within the scope of his employment is one for you to determine under all the evidence in the case."

The objections to the first paragraph have been disposed of by our conclusion that the evidence was sufficient to justify a finding by the jury against Tri-State.

The second paragraph left to the jury the question whether Mooney's act was within the scope of his employment. Where, under all the facts and circumstances, different inferences may be fairly drawn, the question of whether a wilful tort was within the scope of employment is properly determined by the jury. 18 R. C. L., Master and Servant, sec. 254, pp. 795-796; 39 C. J., Master and Servant, sec. 1591, p. 1361.

The objection to the admission of certain testimony of the witness Nelson as rebuttal evidence is without merit. A question as to whether there were one or more occupants of the car in addition to plaintiff had arisen. This witness was recalled to clarify his previous testimony upon that subject. We find no error in the trial court's ruling which allowed this witness to explain his previous testimony which had been, to some extent, impeached.

For the reasons set forth, we are of opinion that the judgment should be affirmed.

*Affirmed.*